**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 26-21671-Civ-TORRES

TIMO SCHEIDER,

      *Petitioner,*

v.

JESSICA LAURA HINTERSEER-SCHEIDER,

      *Respondent.*

_____/

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*
*AND ORDER DENYING PETITION FOR RETURN OF CHILD*

In the context of an unfortunate marital separation, the question for us is whether Austria was the habitual residence of a ten-year-old boy (who we will refer to as John) who has lived in Miami, Florida since November 2022. John's father, Timo Scheider, petitions under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–9011, for the return of his son to Austria where John was born and where the father now resides. He says the family came to Florida on temporary visas for a limited medical purpose, that he agreed to nothing more, and that when the visa expired the child's continued presence here became a wrongful retention. But John's mother, Respondent Jessica

Hinterseer-Scheider, counters that the family moved here together to better address John's special needs and began to build a life here.

The Court held an evidentiary hearing and has considered the testimony, the exhibits, and the parties' proposed findings. The question is a close and difficult one. At the end of the day, however, the petition is denied because Petitioner has not carried his burden of proving that Austria as a matter of fact was John's habitual residence immediately before the retention. In this respect Respondent's legal position is ultimately well founded. This Court's role is quite narrow: whether the Convention requires that John be returned to Austria so that only a court there can address the difficult custody and care issues for John and his family. We find that the Convention does not require this federal court to Order that the child be returned to Austria. We can leave it to family court to adjudicate the custody dispute over where John would be best cared for, as well as immigration authorities to determine if Respondent and John are ultimately able to legally remain in the United States.

### *FINDINGS OF FACT*

### I.     *The Parties and the Child*

1.     Petitioner Timo Scheider is a citizen of Austria and resides in Lochau, Vorarlberg, Austria. He is a professional racecar driver and maintains business interests in Austria and Germany.

2.     Respondent Jessica Laura Hinterseer-Scheider is a citizen of Austria and now resides in Miami-Dade County, Florida.

3. The parties are the parents of John Hinterseer-Scheider, born April 12, 2016 in Bregenz, Austria. John was ten years old at the time of the evidentiary hearing.

4. John was born prematurely, was hospitalized after birth, and has experienced developmental delays. He has received speech, occupational, and physical or structural therapies at various points in his life, first in Austria and later in Florida. Both parties agree he has special needs and that continuity of therapeutic care matters to his development.

5. The parties were not married when John was born. They married on September 28, 2019 in Kitzbühel, Austria.

6. After John was born, the parties continued to live in Austria.

## II.  *The Family Relocates to Florida*

7. In December 2021 the parties traveled together for the first time with John from Austria to Florida. Respondent characterizes this trip as the family's relocation and the beginning of John's continuous residence here. Petitioner describes it as a ninety-day visit under the visa-waiver program, undertaken because pandemic restrictions in Europe had interrupted John's therapies, after which the family intended to return to Lochau.

8. Petitioner was thereafter offered a position with The Elkins Group, LLC, which sponsored him for an O-1 nonimmigrant visa premised on extraordinary ability. The visa authorized a stay of approximately two and one-half years and

was initially set to expire in June 2025. Petitioner was to be compensated on an as-needed basis.

9. The parties jointly decided that Petitioner should accept the arrangement so the family could return to Florida and pursue medical and therapeutic options for John.

10. In November 2022 the family relocated to Florida under that visa. They brought clothing but left the majority of their personal belongings and all of their household furnishings in Austria.

11. Instead, the parties leased a furnished apartment in Aventura for a one-year term.

12. John's residence in Florida thus began in November 2022. Measured to June 30, 2025 (the date the Court finds the retention period began) that is about thirty-one months. Measured to the evidentiary hearing, approximately three and one-half years.

13. When the parties' first lease ended in October 2023 they jointly entered a second one-year lease for a furnished apartment at a different location, the Aria on the Bay in Miami, running through November 1, 2024.

14. In early 2023 the parties took John to Nicklaus Children's Hospital in Miami, where physicians recommended physical, speech, and occupational therapy.

15. John then received speech and occupational therapy at Kids Therapy Connection in South Miami, and structural integration and physical therapy from other South Florida providers. Respondent testified these services have

continued since 2023 even though Petitioner claims John has not seen a physician in Florida since 2023.

16. The fact is that John's *physician* encounters in Florida may have been concentrated in 2023, principally at Nicklaus Children's Hospital. His *therapeutic* services — speech, occupational, and physical or structural — have continued on a recurring basis from 2023 through the present with identified providers. The Court credits Respondent's testimony on the latter point, which was specific as to providers and locations and was not meaningfully impeached.

17. The continuity of John's therapeutic relationships is affirmative evidence of his integration into life in South Florida.

18. Given his special needs, John is home-schooled by Respondent and has been throughout his time in Florida. He is not enrolled in and does not attend a school in Miami.

19. John currently lives with Respondent, his primary caregiver, in their Miami apartment. His daily routine and his therapeutic providers are in South Florida.

20. Throughout the period the family was in Florida, the parties still had connections to Austria. Petitioner retained the home he had purchased in Lochau, together with its furniture and furnishings, including John's bedroom. The parties maintained Austrian bank accounts, Austrian and German telephone numbers, health insurance for John in Austria, and their formal residence registration with the Austrian government.

21. Respondent updated her own Austrian registration during this period, listing her parents' address as her primary residence and Petitioner's home as her secondary address.

22. Petitioner continued to operate his businesses in Austria and Germany and traveled between Florida and Europe throughout. But he and his family were lawfully residing in the United States under his visa.

23. While they were living in Florida, neither party earned income in the United States, filed a United States tax return, or obtained a Florida driver license.

### III.   *October 2024 Through March 2025*

24. In September 2024, as the Aria on the Bay lease approached the end of its term on November 1, 2024, the parties discussed returning to Austria in October 2024.

25. Respondent did not want to return. She executed a new one-year lease for the same apartment, without prior discussion with Petitioner, and informed him after the fact. By this point, the Parties' marital relationship began to falter.

26. The parties then discussed how Respondent and John might remain lawfully in the United States, including extending the O-1 visa and the possibility of a green card.

27. In November 2024 Petitioner consulted an immigration attorney and reported to Respondent that a green card was not a viable option given that such an application commits the applicant to a primary United States residence over the medium to long term.

28. Neither party applied for a green card. And Petitioner did not seek to extend the O-1 visa, which expired in June 2025.

29. During this period, the parties formally separated. Petitioner was then travelling back and forth for his businesses. He visited John in Miami on approximately five or six occasions between April 2024 and December 2024, staying at the Aria on the Bay apartment, by agreement with Respondent, so that he would have full access to his son.

30. In March 2025 Petitioner planned another visit. Because Respondent's parents were planning to occupy the apartment during the same period, Respondent told him that he could not stay there and that his time with John would be supervised and scheduled at her convenience.

31. On or about March 15, 2025, Petitioner communicated to Respondent that he did not consent to John remaining in Florida after the expiration of the O-1 visa.

32. On March 21, 2025 Respondent filed a petition for dissolution of marriage in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County. Petitioner was served in Miami on March 24, 2025, shortly before his return flight to Austria.

33. Later, on June 9, 2025 Respondent submitted to United States Citizenship and Immigration Services an Application to Change Status to F-1 nonimmigrant student status for herself, with derivative status for John, in connection with a forty-week intensive English program. She did not discuss the application

with Petitioner beforehand, testifying that she did not do so because she knew he did not consent to John remaining after the O-1 expired.

34. Thus although Respondent is correct that Petitioner did not formally demand the return of John to Austria until after her dissolution petition was filed, she knew that Petitioner did not want to extend their family's relocation beyond June.

35. Although it may have no consequence for purposes of this proceeding, Respondent's claim that Petitioner raised that prospect for the first time after the dissolution action does not square with their communications before March 2025.

36. Petitioner's last in-person visit with John was in March 2025. He has not traveled to Miami since until the time of the evidentiary hearing in this proceeding. He maintains a weekly Sunday telephone call, and Respondent has not obstructed telephone contact.

### IV.  *Convention Proceedings*

37. Following his return to Austria, Petitioner filed an Application for Return with the Austrian Central Authority on June 28, 2025.

38. The Austrian Central Authority transmitted the matter to the United States Central Authority, which contacted Respondent about voluntary return. Respondent did not voluntarily return John.

39. Respondent's change-of-status applications have not been adjudicated. Respondent and John are lawfully present pending adjudication. The Court

does not find that either is under an immediate or identified threat of removal; no removal proceeding, notice to appear, or enforcement action was shown. The Court likewise does not find that either has any permanent or long-term status. Their present authorization is contingent and derives from the pending application.

40. Petitioner commenced this action by petition filed with the Clerk of this Court on March 13, 2026.

## V. *The Parallel State Proceeding*

41. In the state dissolution action, Petitioner moved to quash service and to dismiss for lack of personal jurisdiction, lack of subject matter jurisdiction, and *forum non conveniens*. The state court denied those motions by order dated October 24, 2025.[1]

42. Petitioner appealed to the Third District Court of Appeal. See *Scheider v. Scheider,* No. 3D25-2348.

43. After the matter was fully briefed in the appellate court, Petitioner filed an emergency motion to stay proceedings at about the time of the evidentiary hearing in this case (presumably arguing that the proceedings here could or should moot the state dissolution action). The Court of Appeals, however, denied that motion on May 20, 2026.

---

[1] The state action was dismissed without prejudice on March 3, 2026. By order dated March 26, 2026 the state court vacated the dismissal and set the matter for mediation. The state action is pending.

44.     The Third District Court of Appeal ultimately ruled on the merits of the appeal on July 30, 2026. The Court affirmed *per curiam* the state court's Order denying the motion to dismiss, relying upon established Florida case law that jurisdiction for dissolution proceedings required one of the parties to the marriage to reside six months in the state before the filing of the petition; that a person may be a legal resident of Florida without being an American citizen, as it is legal residence, not citizenship, that is the statutory prerequisite for filing a marriage dissolution action in the state; and that Florida was a proper forum to adjudicate the action and resolve custody where the parties and their minor children are, and have been for a considerable time, residents of Florida.

## CONCLUSIONS OF LAW

### I.   *The Governing Framework*

The Convention seeks "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *Calixto v. Lesmes*, 909 F.3d 1079, 1083 (11th Cir. 2018) (quoting *Hanley v. Roy*, 485 F.3d 641, 644 (11th Cir. 2007)). The Hague Convention allows an individual to "petition a court authorized to exercise jurisdiction in the place where a child is located for the return of the child to his habitual residence in another signatory country." *Chafin v. Chafin,* 742 F.3d 934, 936 (11th Cir. 2013). The Convention and its implementing legislation "empower courts in the United States to determine only rights under the Convention and not

the merits of any underlying child custody claims." *Gomez v. Fuenmayor,* 812 F.3d 1005, 1011 (11th Cir. 2016) (quoting 22 U.S.C. § 9001(b)(4)). Accordingly, a federal court's role is limited to acting as a gatekeeper to restore the parties to the pre-abduction or pre-retention status quo so that issues of child custody may be determined in the proper contracting state. *Seaman v. Peterson,* 766 F.3d 1252, 1257 (11th Cir. 2014) (citing *Lozano v. Montoya Alvarez,* 572 U.S. 1, 4-5 (2014); *Abbott v. Abbott,* 560 U.S. 1, 9 (2010); *Ruiz v. Tenorio,* 392 F.3d 1247, 1250 (11th Cir. 2004)).

A petitioning parent must prove by a preponderance that the child was wrongfully removed or retained. 22 U.S.C. § 9003(e)(1); *Berenguela-Alvarado v. Castanos,* 950 F.3d 1352, 1358 (11th Cir. 2020). That requires three prima facie showings: habitual residence in the country to which return is sought immediately before the removal or retention; breach of the petitioner's custody rights under that country's law; and exercise of those rights, or that they would have been exercised but for the removal or retention. *Id.* (citing Convention art. 3).

If the petitioner carries that prima facie burden, the respondent may resist return by satisfying a prescribed exception or affirmative defense under the Convention, 22 U.S.C. § 9003(e)(1)–(2). The exceptions/defenses are narrowly construed and, even if proven, do not automatically preclude return. *Baran v. Beaty,* 526 F.3d 1340, 1345 (11th Cir. 2008); *Gomez,* 812 F.3d at 1011. Some defenses require a showing by clear and convincing evidence (like Article 13(b) for grave risk to the child if returned or Article 20). The other defenses under Article 12 and remaining

Article 13 exceptions (like consent, acquiescence, settled child, mature child, etc.) require only a preponderance of the evidence. 22 U.S.C. § 9003(e)(2).

If a petitioner carries the prima facie burden, but the respondent fails to carry his/her burden of satisfying an exception or defense under the Convention, then the court must order the child returned to the petitioning parent. *See Berenguela-Alvarado,* 950 F.3d at 1360 (citing *Gomez,* 812 F.3d at 1011).

## II.  *Prima Facie Showing of Habitual Residence*

### A.  *The Governing Standard*

In *Monasky v. Taglieri,* 589 U.S. 68 (2020), the Supreme Court held that a child's habitual residence is the place where he is "at home," determined on the totality of the circumstances, an inquiry "unconstrained by precise rules." *Id*. at 76–78. Two features of the *Monasky* standard govern here. An "actual agreement" between the parents is not required. *Id*. at 81. And: "For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases." *Id*. at 78.

Here, the circumstances of John's parents are not extraneous to the question of where John was at home. He was six when the family arrived and nine when the Respondent's purported retention began. A child of that age lives inside the arrangements his parents make, and the durability of those arrangements is evidence

about his life, not merely theirs. And that is particularly true for John given his special needs. The Court weighs all these circumstances accordingly.

But because *Monasky* rejected any requirement of shared parental intent, decisions treating such intent as a key threshold no longer govern. *See, e.g., Castang v. Kim*, No. 1:22-CV-05136-SCJ, 2023 WL 2373611, at *7 (N.D. Ga. Feb. 2, 2023). In particular, to the extent the Eleventh Circuit's 2004 decision in *Ruiz v. Tenorio,* 392 F.3d at 1247, treated a settled share intention to abandon a prior residence as a threshold the petitioner must clear before acclimatization evidence may be considered, that requirement did not survive *Monasky*. The Supreme Court expressly rejected the framework espoused by the Ninth Circuit decision that *Ruiz* relied upon, *Mozes v. Mozes,* 239 F.3d 1067, 1073–1081 (9th Cir. 2001), *abrogated by Monasky,* 589 U.S. at 76-81.

After *Monasky,* the Eleventh Circuit has continued to consult the *Ruiz* and *Calixto* factors (i.e., settled intention, an actual change in geography, and the passage of time sufficient for acclimatization) as relevant evidence within the totality. *See, e.g., Lee v. Curcio*, 2025 WL 2814147, at *3 (11th Cir. Oct. 3, 2025) (unpublished) (citing *Calixto v. Lesmes,* 909 F.3d 1079, 1084-85 (11th Cir. 2018)); *Goldstein v. Simon,* 2024 WL 4284921, at *2-3 (11th Cir. Sept. 25, 2024) (unpublished). We thus have to do the same, but we can no longer treat shared parental intent as a gate that forecloses the inquiry, which is what Petitioner's submission asks and what *Monasky* forbids.

In short, parental intent remains a relevant factor but only within an evaluation of all relevant factors in their totality, with the goal of identifying whether a petitioner has met his burden of establishing where the child habitually resides, not whether the district court could identify an alternative residence. *See, e.g., Alzu v. Huff,* 165 F.4th 1073, 1076–77 (8th Cir. 2026) (affirming denial of petition based on petitioner's failure to show child's place of birth continued to be habitual residence after mother and child relocated to United States).

Petitioner may never have had an intent to reside in the United States permanently, despite his efforts at obtaining a long-term work visa here. But that intent, which we find credible, is not the end of the story. Other factors in the record may point elsewhere, as we discuss further below.

### B.    *The Timing of Any Retention*

Petitioner alleges a wrongful retention. Article 3 of the Convention measures habitual residence "immediately before the removal or retention." Courts fix that date in two main ways. One way focuses on when any pre-retention/agreed-upon period for a child to remain away from her residence expires, i.e. "when the agreed date passes, not when the earlier notice of intent is given," *Chechel v. Brignol*, No. 5:10-cv-164, 2010 WL 2510391, at 7 (M.D. Fla. June 21, 2010); *accord Jardim v. Paez,* No. 25-24087-Civ-Bloom, 2025 WL 3701303, at *5 (S.D. Fla. Dec. 19, 2025), *aff'd,* 2026 WL 986504 (11th Cir. Apr. 13, 2026). In this respect, one's communications to the other parent of unhappiness or intent to rescind consent does not trigger "retention"

under the Convention. That intent must manifest itself into a clear demand for return of a child. Only if that demand is not heeded will "retention" be possible.

Another way is to focus on the last date upon which it is "undisputed that [the child was] present in the United States with [both parents'] permission." *Karkkainen v. Kovalchuk,* 445 F.3d 280, 291 (3d Cir. 2006). Again, under this formulation the trigger is a point in time when mutual consent for a child to be away from habitual residence ceases.

The former formulation was adopted by the Eleventh Circuit directly. In *Palencia v. Perez*, 921 F.3d 1333 (11th Cir. 2019), the court held that "[t]he district court correctly ruled that the wrongful retention took place in July of 2017, when Mr. Palencia's consent for H.J.D.V. to remain in the United States expired." *Id.* at 1343. The court adopted the rule that "the date consent was revoked constitute[s] the date of wrongful retention," joining *Marks ex rel. SM v. Hochhauser*, 876 F.3d 416 (2d Cir. 2017), *Darin v. Olivero-Huffman,* 746 F.3d 1 (1st Cir. 2014), and *Blackledge v. Blackledge*, 866 F.3d 169 (3d Cir. 2017). *Ibid.* And it instructed that a court should not look to the date the retaining parent formed an intent to retain, but to the date the petitioning parent learned the true nature of the situation. *Id.* at 1342.

Under any of these formulations the answer here is the same. Petitioner's consent was bounded by the O-1 visa. It expired on June 30, 2025. That is the date the agreed period ended; it is the last date on which John was present with both parents' permission; and because Petitioner's March 15, 2025 communication was prospective in operation (addressed to the period after the visa expired) it is also the

date on which the withdrawal of consent took effect. The retention began June 30, 2025. The record supports no earlier date, but it squarely fixes the date at this point in time.

Evidence of this finding can also be found in Respondent's filing of her state court petition for dissolution in March 2025, where she alleged that Petitioner had through then granted permission for John to live with Respondent in Florida. That was a true allegation, but only because Petitioner's lack of consent did not manifest until June. Respondent cannot rely on an earlier retention period under those circumstances.

Thus the Court will conduct its analysis as of that date. In doing so, by then John had lived in Florida about thirty-one months, from age six to age nine. (Respondent claims that the date was even sooner than that, but as we find above the weight of the evidence supports the Petitioner's proposed date which we adopt).

### C.     *Austria Was Not John's Habitual Residence in June 2025*

The parties agree that John was born in Austria, lived there for his first six years, and that Austria was his habitual residence when the family departed. They agree both parents hold rights of custody under Austrian law. They agree John has lived in Miami with Respondent since the family's arrival and that Petitioner knew where he was at all times. The dispute reduces to one question: whether, by June 30, 2025, John's residence in Florida had acquired the quality of being habitual, displacing Austria.

Petitioner relies on the fact that John has never been enrolled in a school in Florida. School attendance is ordinarily among the most significant indicators of a child's integration, because it embeds a child in a community of teachers, classmates, and institutional routines located in a particular place. Its absence is a relevant factor in the totality of circumstances analysis.

But John has special needs. Traditional school attendance here or in Austria, without further development with time and therapy, is not a given. And the Court finds Respondent credible that she has been administering home instruction in the meantime between his therapies. It is not evidence of an unbreakable connection with Florida but it does count.

Petitioner responds that home instruction proves nothing, because a parent's teaching is portable: it attaches the child to a person rather than to a place and would continue unchanged in Lochau. As a general matter that is right, and the Court would ordinarily give home instruction little weight in an acclimatization analysis. It carries more weight here for a specific reason: John's instruction is not a substitute for a Florida school he might otherwise attend. It is the arrangement that makes his therapy schedule possible, as it is scheduled around recurring appointments with speech, occupational, and physical or structural therapists at identified South Florida facilities. Those relationships are not portable. The instruction that is organized around them is evidence of the shape of his week, and his week has been organized around these facilities going on four years.

Petitioner then points to the fact that John has no extended family in this district. His relatives on both sides are in Austria and Germany. The family maintained, throughout, a home in Lochau with John's bedroom intact, Austrian health insurance for John, Austrian bank accounts, Austrian and German telephone numbers, and formal Austrian residence registration. To date, neither parent appears to have earned income here, filed a tax return here, or obtained a driver license here. They lived in furnished rentals under successive one-year leases and never shipped their household goods.

Moreover, the family's presence rested throughout on nonimmigrant status with a fixed expiration. In November 2024 the parties considered permanent residence but Petitioner declined it, having advised that a green card commits the applicant to a primary United States residence over the medium to long term and that this "was not the family's situation." At the same time, however, the Petitioner inquired whether his current visa could be extended. He even indicated to Respondent that he intended to apply for an extension of that visa via text on November 20, 2024. (PX12).

Immigration status is a legitimate consideration in the habitual-residence analysis, not merely in the settled-child inquiry. *Alzu*, 165 F.4th at 1076–77 (affirming a district court that weighed the parents' immigration statuses within the totality). Taken with the maintained Austrian home, registration, and insurance, the uncertain future immigration status for the parties and John supports Petitioner's

claim that the family that had not fully severed its life in Austria and, at least in Petitioner's view, he did not intend to.

On the other hand, the parties' discussions during this period expressly evidence a back and forth about what was the right thing to do and what could be done to stay in the United States as Respondent wanted. And so, by the date when Petitioner's consent to his stay was withdrawn in June 2025, John lived in Florida approximately thirty-one months — from age six to age nine. Those are formative years. They represent roughly one-third of his life and the entirety of his memory of a settled routine, entirely with his mother and regularly with his father when he was not traveling for work. So he lived for this extended period in a stable household with his primary caregiver. There was no concealment; Petitioner always knew the address and was received there multiple times even after the separation.

And while living in Florida, as referenced earlier John received recurring speech, occupational, and physical therapy from identified South Florida providers, beginning in 2023 and continuing through the retention date and beyond. For a child with developmental needs, an established therapeutic team is a substantial and place-specific connection that give rise to relationships with particular clinicians at particular facilities, built over almost four years.

The Court also finds that Petitioner's own conduct is evidence of the family's actual arrangement, independent of his stated intentions. He obtained the visa that made the stay possible. He traveled with the family and helped find places to live. He signed the initial one-year lease agreements. He participated in selecting John's

providers. He visited five or six times and stayed in the household. That is evidence of what the family in fact did, not merely of what he meant.

Weighing all of these facts in their totality, and by the preponderance of the evidence presented on the paper record and the testimony elicited at the evidentiary hearing, the Court concludes that Petitioner has not carried his burden of proving that Austria remained John's habitual residence on June 30, 2025. Indeed, his habitual residence was no longer in Austria well before that date.

The acclimatization evidence in this record is plentiful and weighs heavily in Respondent's favor. It consists of duration, household stability, and a continuing course of therapy. Duration alone, of course, cannot suffice. *Alzu*, 165 F.4th at 1077 ("Exclusive residence in a single country, however, does not alone establish habitual residence."). Nor would cohabitation with the retaining parent, which is a feature of nearly every retention case. What tips the balance is the combination of thirty-one formative months in one household with an established, place-specific therapeutic network, set against Austrian ties that, while genuine, are predominantly the parents' administrative and proprietary arrangements rather than John's lived connections. A preserved bedroom and a maintained insurance registration are far outweighed by the fact that, by June 30, 2025, John had not lived in that bedroom for thirty-one months, and he was now nine years old. And, significantly, the decision to alter his residence was not unilaterally Respondent's; it was indeed a family decision that, when made, was borne out of their goal of furthering John's treatment and best addressing his special needs.

Petitioner's strongest argument is that the family's presence was visa-limited from the start, that permanent status (at least by him) was considered and rejected, and that a residence with a known terminus cannot be "habitual." But it does not carry the day, for two reasons. First, habitual residence has never required lawful permanent status. If it did, the child of a long-term visa holder could acquire a habitual residence nowhere, however completely his life took root, and the Convention would command return in cases where the child is only "at home" in the requested State. Second, the argument again establishes the parents' expectations more than the child's circumstances, and while *Monasky* makes the former relevant it makes the latter the object of the inquiry.

And ultimately where Petitioner fails in satisfying the first element of his claim under the Convention is in the legal definition of "retention." The Eleventh Circuit has held that the term "retention" is meant to cover the circumstances where a child has been prevented from returning to "his usual family and social environment" in which he has developed. *Pielage v. McConnell*, 516 F.3d 1282, 1288 (11th Cir. 2008) (citing the Perez-Vera Report that "was the official Hague Conference reporter whose report is 'recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.' " (quoting *Ruiz,* 392 F.3d at 1251 n. 2)).

In other words, a retention occurs when a child is not allowed to return to the place where he has been developing in his usual family and social environment, i.e.

the habitual residence. "The archetype of this conduct is the refusal by the noncustodial parent to return a child at the end of an authorized visitation period." *Silverman v. Silverman,* 338 F.3d 886, 897 (8th Cir. 2003). And this why the only point in time when habitual residence is relevant under the Convention is immediately before this retention event. *See, e.g., In re S.L.C.,* 4 F. Supp. 3d 1338, 1346 (M.D. Fla. 2014). But if that period was extended, then the relevant date is the end of the extension period. *See, e.g., In re Ahumada Cabrera,* 323 F. Supp. 2d 1303, 1312-13 (S.D. Fla. 2004).

Before November 2022, John was developing in Austria where he was born and most of his family was. But his parents relocated to Florida. They leased a new furnished apartment in 2022 and began to make a home there for the family. They leased a different apartment in 2023. And during this time, John was growing in a new environment, primarily with his two parents but sometimes just with Respondent when Petitioner was away traveling. And when his parents separated in 2024, he remained in Florida where he had now developed new social, environmental, and medical connections for his well-being. That continued well into 2025 through June when Petitioner formally withdrew his consent and refused to extend that period any further. At that point, John was no longer habitually residing in Austria; his family, social, medical, and caretaking connections were no longer present there. Those connections had long taken root in Florida (whether the father ultimately wanted that to happen or not). The bottom line is that is where John resided for purposes of the Convention, not Austria.

To put it plainly, when analyzing Petitioner's right to relief under the Convention, can we make the necessary finding for him that John, in June 2025, had the strongest family and social connections in Austria? No. Too much time, too many changes in residence, and too many connections were developed in Florida by then. Hence he was not "habitually" living in Austria any more at the start of the purported retention period. Under the Eleventh Circuit's (and indeed the Convention's framers') definition of retention, there was no "wrongful" retention to trigger any rights or remedies under the Convention.

This is quite analogous to the holding in *Pielage*, which affirmed the dismissal of an ICARA petition that sought to set aside state court custody orders entered before a petition was filed by a Dutch mother claiming that the father and Alabama courts were wrongfully retaining a child that had established habitual residence in the Netherlands. The Court affirmed the dismissal of that petition because the child's strongest family and environmental connections by that point remained in Alabama. Thus, there was no "retention" for purposes of the Convention. 516 F.3d at 1289 ("There having been no retention, there can have been no 'wrongful retention.' ").

John was not born in Florida. But he relocated to Florida many years before the alleged triggering events, during which time he had developed sufficient familial, social, medical and caretaking roots such that he was now fully developing in Florida. As the Third District Court of Appeal concluded in affirming the state court's custody orders here, sufficient ties now bind John with this jurisdiction. For purposes of the Convention, he was thus not habitually residing in Austria any longer in June 2025.

*Scheider v. Hinterseer-Scheider*, No. 3D25-2348, 2026 WL 2191581, at *1 (Fla. 3d DCA July 30, 2026).

And cases the Third District Court of Appeal relied upon are quite relevant here to bolster that conclusion. In *De La Riva v. Soto,* 183 F. Supp. 3d 1182 (M.D. Fla. 2016), Judge Steele addressed a Hague Convention/ICARA child-retention case filed by a mother who claimed that the father's refusal to send the parties' son, G.V.B., back to Mexico after an agreed 2014 visitation period amounted to a "wrongful retention" under the Hague Convention. The court found that, although G.V.B.'s habitual residence was initially the United States, it shifted to Mexico before April 2014 because both parents shared an intent to move to Mexico, the child physically relocated, and he became fully acclimated there. The mother had enforceable custody rights that she was actively exercising, so the father's post-visitation refusal to return the child constituted wrongful retention. The father argued that the child's habitual residence remained in the United States, where he was born, that he did not intend to relocate to Mexico permanently, and that the mother decided to move to Mexico over his objections. The Court found, however, that the habitual residence shifted away from the United States and to Mexico once the father agreed to move there for a period of time, which was long enough for the center of the child's family and social life supplanted the life he had before. So the father had agreed to change the child's residence to Mexico, where the child's family and social environment became settled after relocation and where he became acclimated. *Id.* at 1193-94.

Our case is a mirror image of *De La Riva,* where parents initially agreed to relocate a child for his well-being from where he was born, to a location where he stayed a sufficiently long time to develop family and social connections and a new environment, and where at least one of his parents wanted to remain. Initially John's habitual residence for purposes of the Convention was in Austria; but after so much time and circumstances passed following the parents' relocation to Florida, Austria was supplanted as the habitual residence under the Convention. The same factors that compelled Judge Steele to find that the Convention applied to cure a wrongful retention there, are the factors that compel us to find that *no* wrongful retention took place here.

The typical wrongful retention case we have found is where parties to the United States for a limited purpose, such as visiting family, and then one party declines to return to the family home, overstays a tourist visa, and then seeks to stay permanently or files for divorce in Florida. *See, e.g., Horacius v. Richard*, 720 F. Supp. 3d 1287, 1296–97 (S.D. Fla. 2024), *aff'd,* 2024 WL 3580772 (11th Cir. July 30, 2024), *cert. denied,* 145 S. Ct. 1926 (2025) (granting petition and finding that Canada was place of habitual residence; "A.H. was born in Canada and only left Canada on a temporary trip to the Dominican Republic. Respondent never moved the family's belongings from the storage unit in Canada and presently continues to pay for storage. Respondent's and A.H.'s immigration status in the United States was temporary. The fact that at this point, A.H. has lived in the United States for longer than she ever lived in Canada does not disturb this analysis."); *Ruiz v. Zinsou*, No.

1:22-CV-02293-SDG, 2022 WL 3931454, at *2 (N.D. Ga. Aug. 31, 2022) (granting petition where parents, an unmarried couple, lived together with their son, K.P.C.A., in Colombia from 2015 until May 2021, but father authorized travel to Georgia with the mother for a fixed two-week period, but mother did not return with the child as agreed; the retention became wrongful because the father never unequivocally consented to the extension and Colombia was always the child's habitual residence, given six years of continuous residence there, including schooling, family ties, and activities).

The facts here are demonstrably different. The parties relocated here by seeking a lawful visa allowing for extended employment. The purpose was not a temporary visit; it was to find a new location where the child could receive better care and treatment for his special needs. The parties obtained housing, retained local treating physicians and caregivers, and considered ways in which they could make their relocation more permanent before their marital union separated. And the child's family and social development continued for years, well before any act of retention ever occurred. Only then were dissolution and custody proceedings filed in the place where they were settling new roots. Thus, unlike those cases where the child's habitual residence was never supplanted, John's was. So this case presents a situation where the petitioner fails to satisfy the first element of the Convention because his home country was no longer the child's habitual residence.

Take the Eleventh Circuit's 2024 unpublished decision in *Goldstein v. Simon,* 2024 WL 4284921. The parents had three children born in New York between 2015

and 2020. The family relocated to Israel in December 2020, where the children became Israeli citizens, attended school, and took part in extracurricular activities, though they never learned Hebrew. After Hamas viciously attacked Israel in October 2023 while the family was vacationing in Italy, they decided to relocate to Miami because of the war. Then, in Miami, the children enrolled in school, saw doctors, participated in activities, and spent time with family. The parents later disagreed about whether to stay in Florida or return to Israel, and while still living together with the children in Miami, the mother filed an ICARA petition under the Hague Convention seeking an order returning the children to Israel, arguing the father was wrongfully retaining them. Chief Judge Altonaga denied the petition, finding that the children's habitual residence was now in Florida (and alternatively, that even if it were Israel, the father had not wrongfully retained the children).

On appeal, the Eleventh Circuit affirmed. *Id.* at \*3. It held that a habitual-residence determination focuses on the "totality of the circumstances" legal standard, and that under that deferential standard, the district court did not clearly err in finding the children's habitual residence was in Florida. The relevant factors supporting that judgment were based on the parties' shared intent to remain in Florida for the duration of the war (at least six months to a year), the children's enrollment and acclimatization to school and community life in Miami, the father's credible trial testimony, and the family's history of transient relocations. *Id.* at \*2-3. Because the habitual-residence finding was dispositive, the court did not need to reach the mother's remaining arguments about wrongful retention or the "grave risk

of harm" exception. It instead affirmed the denial of the petition on the habitual residence finding. *Id.* at *4.

Here, a similar record supports Respondent's position. We find that Petitioner has failed to satisfy the first, and indeed most essential, prima facie element under the Convention. He has not shown by a preponderance of evidence that Austria was John's habitual residence as of June 30, 2025. The parties had a shared intent to relocate to Florida, at least for a period of time to help John based on therapy limitations they found in Austria after the pandemic. Having done so, John's life relocated to Florida. His closest family, social, medical, and caretaking connections by June 2025 were found in Florida, not Austria. Therefore, Article 3 of the Convention does not require this Court to Order John's return to Austria to allow Petitioner to pursue his custodial rights in that jurisdiction.

The Court's conclusion draws support from decisions in other Circuits as well. *See Carvajal Vasquez v. Gamba Acevedo*, 931 F.3d 519, 529-30 (6th Cir. 2019) (affirming denial of a petition alleging retention beyond the expiration of a tourist visa, where the child's habitual residence had become the United States, the father voluntarily brought the child to the United States to join the mother who wanted to stay permanently); *Roche v. Hartz,* 783 F. Supp. 2d 995, 1001-02 (N.D. Ohio 2011) (denying petition; "In this case, the Court finds that by October 2009—twenty-six months after their arrival—the children's habitual residence had changed from Australia to America. Importantly to this determination of habitual residence, LR and AR came to America when they were four and one years old, respectively, and

have continuously resided here since. Neither LR nor AR had attended any school in Australia before coming to the United States. Within a few weeks of their arrival in America, LR was enrolled at Orange. LR was in school essentially full time from his arrival in August 2007 until and after the date of retention, and, by all accounts, had fit in 'quite well.' . . . [The children] frequently saw doctors, therapists, and other health professionals in the Cleveland area. These facts establish that the boys would have perceived America to be their permanent residence, rather than 'merely a temporary journey' before they returned to Australia.").

### D.    *Other Issues and Arguments Are Moot*

Having found that the first element of the prima facie showing has not been established, we need not address other arguments that the parties raised or argued about. Respondent, for instance, contends that Petitioner consented to John's presence in Florida and that Article 13(a) therefore excuses return. We need not make a final ruling on this defense under Article 13(a) for the reasons addressed above, but we note that Petitioner clearly has not consented to John's stay in Florida after June 30, 2025, which is the date of retention we have determined in this record. Given that finding, a "consent" defense is doubtful, but ultimately moot.

Respondent's acquiescence theory would likely fail as well, for reasons that reinforce the point. Consent concerns the parent's state of mind before or at the retention; acquiescence concerns conduct afterward. Petitioner withdrew consent unequivocally, objected to the unilateral lease extension, applied to the Austrian Central Authority within roughly three months of the retention, declined voluntary

resolution on Respondent's terms, and filed this action within the year. That is not a course of acquiescence. But again, we reach no final conclusion because the prima facie showing ends the analysis.

Similarly, the Court makes no finding whether John is "settled" within the meaning of Article 12, assuming that Petitioner had established in the first place that Austria was the place of habitual residence. The settled inquiry under *Fernandez v. Bailey*, 909 F.3d 353, 361 (11th Cir. 2018), is an equitable exception arising only after a year has run. It is not a substitute for the habitual-residence element, and the Court has not treated it as one.

Finally, Respondent asks the Court to take judicial notice of the state court's October 24, 2025 and March 26, 2026 orders and to hold Petitioner estopped from contesting habitual residence. The Court takes judicial notice of the orders as court records, Fed. R. Evid. 201(b), but declines to give them preclusive effect for three independent reasons.

First, there is no final judgment. Preclusion requires that the issue have been essential to a prior final judgment on the merits. The October 2025 order denied motions directed to service and jurisdiction; it is interlocutory; it has been upheld on appeal to the Third District Court of Appeals. Yet it still, by itself, not a final judgment of dissolution. The state trial court retains authority to reconsider interlocutory rulings until final judgment. *E.g., Bettez v. City of Miami,* 510 So. 2d 1242 (Fla. 3d DCA 1987).

Second, the issues are not identical. Preclusion requires application of "the same rule of law." *In re Harris,* 3 F.4th 1339 (11th Cir. 2021); *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC,* 746 F.3d 1008 (11th Cir. 2014); *Dep't of Health & Rehabilitative Servs. v. B.J.M.,* 656 So. 2d 906 (Fla. 1995). The state court decided whether Florida could adjudicate a dissolution and custody dispute under long-arm, forum non conveniens, and UCCJEA principles. This Court decides whether a child was wrongfully retained outside his habitual residence under a treaty. These distinct issues present different standards to apply even if they are quite related.

Third, ICARA creates an independent federal remedy and vests jurisdiction concurrently in state and federal courts. 22 U.S.C. § 9003(a). If a state court's jurisdictional ruling in a dissolution case could extinguish a Convention return claim before any federal court reached it, the treaty remedy would be defeated by the very domestic litigation Articles 16 and 17 are designed to hold in abeyance.

Hence, though the current status of the state court proceedings support Respondent's arguments generally, we would not be bound by any of the state court orders on this core federal question. So we do not rest our judgment on any "collateral estoppel" or preclusion principles. We instead find, directly under the jurisdiction afforded to us by Article 3 of the Convention and section 9001(a)(4), that the Petition should be Denied on its merits limited to the habitual residence prong of the prima facie test.

To be sure, this Order does not decide who should have custody of John, what parenting arrangement is appropriate, or where he should live in the long term. 22

U.S.C. § 9001(b)(4). Those matters are pending before the state family court now. And we do not address any of the substantial immigration issues that the Respondent and John face for continued residence in Florida. We simply decline to Order Respondent to effectuate John's immediate return to Austria under the Convention.

### III.  CONCLUSION

The Convention rests on a premise about competence: that the courts of the country where a child is at home are best positioned to decide his future, and that a parent should not change the answer by changing the child's address. *Seaman*, 766 F.3d at 1257. Its remedy is a return to the status quo, not a judgment about parenting.

John has lived in Miami with his mother since he was six. He is ten now. His therapies are here, his routine is here, and his father, who obtained the visa, signed the leases, chose the providers, and stayed in the household when he visited, knew where he was every day of it. Austria is where this family is originally from. It is where a great deal of what they own remains. It may well be where a court one day decides John should be. But on this record, at the moment that matters, Austria is not where he was "at home." His habitual residence was elsewhere. Accordingly, no wrongful retention can be found under Article 3 of the Convention.

\* \* \*

## JUDGMENT

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  The Petition for Return of Child under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act is **DENIED**.[2]

2.  Judgment shall be entered in favor of Respondent Jessica Laura Hinterseer-Scheider and against Petitioner Timo Scheider on the Petition.

3.  Petitioner's request for costs, fees, and expenses under 22 U.S.C. § 9007 is **DENIED**, Petitioner not being a prevailing party.

4.  Any passports or travel documents held by the Clerk of Court shall be retained by the Clerk, and Respondent shall not remove the minor child from the Southern District of Florida, until **thirty days** after entry of this Order or, if a notice of appeal is filed within that period, until further order of this Court or of the Court of Appeals.

5.  The Clerk is directed to **CLOSE THIS CASE**, subject to paragraph 4.

    **DONE AND ORDERED** in Chambers at Miami, Florida, this 6th day of August, 2026.

 

_____
EDWIN G. TORRES
United States Magistrate Judge

---

[2]     The parties consented to the exercise of Magistrate Judge jurisdiction upon the direct assignment of the case per the Court's Administrative Order.

Copies furnished to:
Karen E. Lungarelli, Esq., Counsel for Petitioner
Yale L. Galanter, Esq., Counsel for Respondent